IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>**INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (540) 309-5068, THAT IS STORED AT PREMISES CONTROLLED BY US CELLULAR.**<br><br>**INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (540) 354-3316, THAT IS STORED AT PREMISES CONTROLLED BY AT&T CORPORATION.**<br><br>**INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (540) 926-4268 THAT IS STORED AT PREMISES CONTROLLED BY AT&T CORPORATION.** | Case No.    7-23-mj-148<br>                7-23-mj-149<br>                7-23-mj-150 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Ryan Kennedy, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number (540) 309-5068 ("**SUBJECT PHONE 1**"), that is stored at premises controlled by US Cellular, a wireless telephone service provider headquartered at 8410 W. Bryn Mawr Ave., Suite 800, Chicago, IL 60631, in the Northern District of Illinois. The information to be searched is described in the following paragraphs and in Attachment A-1. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require US-Cellular to disclose to the government copies of the information further

described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. I also make this affidavit in support of an application for a search warrant for information associated with certain cellular telephones assigned call number (540) 354-3316 ("**SUBJECT PHONE 2**") and (540) 926-4268 ("**SUBJECT PHONE 3**") that are stored at premises controlled by AT&T Corporation, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408, in the Southern District of Florida. The information to be searched is described in the following paragraphs and in Attachments A-2 and A-3. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T Corporation to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. I am a Special Agent with the FBI and have been so employed since August 2021. I currently work in the FBI Richmond, Virginia, Field Office, Roanoke Resident Agency. I am assigned to work a variety of criminal and national security matters, including the investigation of violent crimes, narcotics offenses, and major offenses such as federal bank robberies and the apprehension of federal fugitives. I have received training and gained experience in conducting investigations, interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, computer evidence identification, and various other criminal laws and procedures. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit

is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. The facts and information contained in this affidavit are based upon my review of the bank surveillance video footage, law enforcement reports and photographs, and from my conversations with law enforcement officers involved in this investigation. The facts comprising the basis for this affidavit are true and correct to the best of my knowledge. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, probable cause exists to believe that Demonte Jameer Belcher ("**BELCHER**") and Ramel Lateef Abrams ("**ABRAMS**") committed violations of 18 U.S. Code §§ 371 and 2113. Probable cause also exists to search the information described in Attachments A-1 through A-3 for evidence of these crimes as further described in Attachment B. Additionally, since this Court has jurisdiction over the offense being investigated, this Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) as it is a "court of competent jurisdiction."

## PROBABLE CAUSE

6. On June 22, 2023, at approximately 11:35 A.M., two males, wearing black hoodies, black pants, black gloves, and masks, entered the Carter Bank & Trust at 1722 Hershberger Road NW, Roanoke, Virginia, and presented a note to a teller requesting money. The note stated, "Let's make everything right. You have least [sic] than 30 seconds to give me $50k or die got nothing To Lose." These males were later described by witnesses as being dark-skinned black males, between approximately 5'8" and 6'0" in height, and of slim build.

7. The taller of the males presented the teller with a blue Chase Bank bag to place the demanded money inside. This male later approached another teller and obtained money from her as

3

well. The shorter male, who was wearing a purple mask, presented a third teller with a bright green plastic bag to place money inside. Both males told the tellers to hurry up. In response to the note and their demands, the tellers provided a total of $8,659 in United States currency to the two males. Included in this currency were several two-dollar bills. At the time of this incident, the deposits of Carter Bank & Trust were insured by the Federal Deposit Insurance Corporation (FDIC).

8. After they received the money, the males exited the bank and ran away. However, they left behind the note that they presented to the teller. This note was then seized by officers with the Roanoke City Police Department (RCPD) and subsequently analyzed by David Sink, a fingerprint analyst with the RCPD. Sink determined that the best method of development to reveal latent prints was to use magna-powder and he applied it to the note. He then observed three finger marks that he determined were of sufficient detail to possibly identify. Sink then entered these marks into the Automated Fingerprint Identification System (AFIS) database. AFIS, in sum, is a system that compares submitted fingerprints against its database of fingerprints. The system then produces a list of potential matches for further examination and comparison.

9. AFIS identified two possible matches with known fingerprints in the database: specifically, those belonging to **BELCHER** and **ABRAMS**. As per normal procedure in fingerprint analysis, Sink then pulled known fingerprint exemplars for **BELCHER** and **ABRAMS** to compare to two of the finger marks that were developed on the note. Based upon his direct comparison of the finger marks and known exemplars, Sink concluded that one finger mark was identical to **ABRAMS'** right thumb and another finger mark was identical to **BELCHER'S** left index finger.[1] The third finger mark developed by Sink has not been identified.

---

[1] **ABRAMS'** criminal history lists him as being 6'02" and 215 pounds. **BELCHER'S** criminal history lists him as being 5'10" and 165 pounds.

10. Investigators with the RCPD then obtained a search warrant for an apartment associated with **ABRAMS** located at 2341 Tuckawana Circle, Apartment 59, Roanoke, Virginia. At approximately 11:00 P.M. on June 22, 2023, law enforcement executed the search warrant at this apartment. **ABRAMS**, along with his girlfriend and her child, was present at the time. Inside the apartment, investigators located the following items:

   a. A pile of wet clothes, to include a black hoodie and black pants, in the back bedroom shared by **ABRAMS** and his girlfriend, the apartment's tenant. It had been raining/misting at the time of the robbery.

   b. In or near this same pile of clothes, a pair of black shoes with a white/silver piece attached to each shoelace near the toe of each shoe. These shoes appear to be consistent with the shoes worn by the taller male who carried the blue Chase Bank bag during the robbery. Inside the shoes were a pair of black winter gloves.

   c. $1,916 in U.S. currency located in the top drawer of a dresser in the same back bedroom.

   d. A purple ski mask and a black hoodie in the living room and a bright green plastic bag in a spare bedroom. The mask and bag appear to be consistent with the mask worn, and bag utilized, by the shorter of the males during the robbery.

11. Investigators subsequently interviewed **ABRAMS**. He denied having participated in the robbery and stated that he was at the apartment on Tuckawana Circle when the robbery occurred. However, he admitted to knowing **BELCHER** and stated that **BELCHER** came over to the apartment on the day of the robbery. Specifically, **ABRAMS** claimed that he woke up between about 12:30 and 1:00 P.M. and that **BELCHER** came over to hang out and smoke marijuana. When pressed about the large amount of U.S. currency found in his bedroom **ABRAMS** also admitted that he sold **BELCHER**

a Glock firearm. **ABRAMS** further advised that **BELCHER** returned to the apartment later that night to obtain pills.

12. Prior to obtaining and executing the search warrant for the apartment, law enforcement conducted surveillance of the Tuckawana apartment and observed **ABRAMS** on a patio outside smoking and talking to his girlfriend. At approximately 7:30 P.M., they observed him using a cellular telephone, and later that night they observed **ABRAMS** exit the apartment to meet an individual who appeared to be **BELCHER**. Therefore, based upon these observations, **ABRAMS'** statements regarding his interactions with **BELCHER**, along with my training and experience, I believe that **ABRAMS** and **BELCHER** likely communicated using cell phones both before and after the robbery.

13. After interviewing **ABRAMS**, law enforcement set out to determine **BELCHER'S** location. **ABRAMS** had advised law enforcement that **BELCHER** stayed with his girlfriend in Vinton and that he had been driving a red Nissan. Law enforcement later observed a red Nissan, registered to **BELCHER'S** girlfriend's mother, at 1171 Ruddell Road, in Vinton, Virginia. Believing that **BELCHER** was inside, they obtained a search warrant for this residence and executed it on June 23, 2023, at approximately 10:51 A.M.

14. **BELCHER**, along with his girlfriend and her child, was present when law enforcement entered the residence. During their search, investigators located $2,215 in U.S. currency, including six two-dollar bills, in a shoebox containing male sneakers, in what appeared to be the master bedroom. In this same bedroom, in a dresser drawer, law enforcement found a blue Chase Bank bag, which appeared similar, if not identical, to the bag used by one of the males during the robbery. In a laundry basket in this same room, they also found a pair of black pants that had a rip and some discoloration on the left leg. These pants appeared similar to the pants worn by the robber who carried the green bag.

15. Incident to the execution of the search warrant at the apartment on Tuckawana Circle, **ABRAMS'** girlfriend, Brianna Hawk, consented to a search of her cellular telephone. Investigators

extracted the contents of this phone on June 23, 2023, and returned the device to Ms. Hawk. Law enforcement asked Ms. Hawk for **ABRAMS'** phone number. Hawk provided (540) 309-5068 (**SUBJECT PHONE 1**) as being **ABRAMS'** number. A review of the extraction of the phone's contents revealed a phone contact named "Bae" with **SUBJECT PHONE 1** listed as the number. Based upon my training and experience, "Bae" is an expression to refer to one's significant other. A review of Hawk's communications with **SUBJECT PHONE 1** from June 22, 2023, reveals text messages sent and received between approximately 2:40 P.M. and 4:56 P.M. Therefore, **ABRAMS** appears to have possessed **SUBJECT PHONE 1** on the day of the robbery.

16.     The extraction also revealed two other phone numbers that may belong to **ABRAMS**. One, 540-354-3316 (**SUBJECT PHONE 2**), is also listed under "Bae." According to open-source records, **SUBJECT PHONE 2** belongs to **ABRAMS** and in a message dated October 18, 2022, Hawk also provides this number to someone asking for Ramel's (Ray's" number. Between September 19, 2022, Hawk and **ABRAMS** primarily communicated using this number, their last contact being on June 19, 2023. Although **ABRAMS** does not appear to have communicated with Hawk using **SUBJECT PHONE 2** on the day of the robbery, considering this appears to be the phone number Hawk most frequently used to communicate with **ABRAMS**, I believe that it is likely that **SUBJECT PHONE 2** was regularly utilized and possessed by **ABRAMS** and would have likely been in his possession on the day of the robbery.

17.     The other phone number potentially associated with **ABRAMS** is 540-926-4268 (**SUBJECT PHONE 3**). This number is listed under "Bae Trap." Based upon my training and experiencing, "trap" is a term that can relate to drug dealing, thus making it possible that **ABRAMS** would possess another phone for that purpose. Based upon the extraction of Hawk's phone, **SUBJECT PHONE 3** communicated with Hawk through calls and text messages between June 18, 2023, and June 22, 2023. Of note, **SUBJECT PHONE 3** communicates with Hawk at, or very close to, the time

of the robbery. At 10:53 A.M., the user of **SUBJECT PHONE 3** advised Hawk that they were about to get food and asked if she is hungry. There are then subsequent phone calls between the two numbers at 10:56 A.M., 11:33 A.M. (duration 3 minutes), and 11:36 A.M (duration 48 seconds). If **ABRAMS** is associated with **SUBJECT PHONE 3**, which there is reason to believe that he is, then he also possessed this phone on the date of the robbery.

18. I am aware that US Cellular provides service for **SUBJECT PHONE 1**. I am also aware that AT&T Corporation provides service for **SUBJECT PHONE 2** and **SUBJECT PHONE 3**. Where appropriate, these three phone numbers will be collectively referred to herein as the **SUBJECT PHONES**. In my training and experience, I have learned that US Cellular and AT&T Corporation are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

19. Based on my training and experience, I know that US Cellular and AT&T Corporation can collect cell-site data about the **SUBJECT PHONES**. I also know that wireless providers such as US Cellular and AT&T Corporation typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information

8

for various business-related purposes. Further, it has been previously reported to law enforcement that U.S. Cellular retains cell-site information up to one year and that AT&T Corporation retains cell-site information all the way back to 2010. Therefore, I believe that both U.S. Cellular and AT&T Corporation currently possess the information, particularly the cell-site information, identified in Attachment B.

20. Based on my training and experience, I know that wireless providers such as US Cellular and AT&T Corporation typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as US Cellular and AT&T Corporation typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONES'** user or users and may assist in the identification of co-conspirators.

21. Based on my training and experience, I know that US Cellular and AT&T Corporation also collect per-call measurement data, which wireless providers also refer to as timing advance data. Timing advance data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data. Additionally, the service provider may collect derivative location information from the timing advance measurements, providing an estimated location of the device. Timing advance data may also be

referred to as per call measurement data, "Real Time Tool" (RTT) data, TrueCall data, Network Event Location System (NELOS), or Location Database of Record (LOCDBOR).

22. In my training and experience, I know that criminals use cell phones to facilitate their crimes and that when a crime involves planning, as was likely required here, the likelihood of such communications occurring increases. I also know that individuals who commit crimes together likely have a preexisting relationship and that like most people their cell phones are their primary means of communication. I further know that individuals, not just those that commit crimes, typically carry a cell phone on their person or within a vehicle they are using to travel to and from locations.

23. Considering the evidence connecting them to the bank robbery, and one another, along with my training and experience regarding cell phones, their use, and U.S. Cellular and AT&T Corporation, I submit that the information to be disclosed by U.S. Cellular and AT&T Corporation is likely to constitute evidence of the crimes under investigation as it will reveal the nature of **ABRAMS'** association with **BELCHER**, the communications they had leading up to, and on, June 22, 2023, and **ABRAMS'** communications and location before, during, and after the robbery. Additionally, records and information from the time frame requested, dating back to April 22, 2023, will also help establish a pattern of life, which in turn, will help determine the relevance or significance of any information related to the **SUBJECT PHONES** and the robbery of Carter Bank & Trust that occurred on June 22, 2023.

## AUTHORIZATION REQUEST

24. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

25. I further request that the Court direct US Cellular and AT&T Corporation to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on US Cellular and AT&T Corporation, who

10

will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Ryan Kennedy
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone on November 28th, 2023.

_____
HONORABLE C. KAILANI MEMMER
UNITED STATES MAGISTRATE JUDGE